Fred D. Clemons v. Commissioner.
Clemons v. Commissioner
Docket No. 12096.
United States Tax Court
1948 Tax Ct. Memo LEXIS 252; 7 T.C.M. (CCH) 81; T.C.M. (RIA) 48017; February 18, 1948
*252 1. Held, payments for protection from arrests and prosecution are not deductible in determining income. 2. Expenses of actually earning income in illegal businesses are deductible in computing net income subject to tax. 3. Fraud penalties approved. William H. Quealy, Esq., 105 So. La Salle St., Chicago, Ill., and H. C. Castor, Esq., 503 Schweiter Bldg., Wichita, Kan., for the petitioner. Gene W. Reardon, Esq., and Harlow B. King, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in income tax and penalties as follows: Year
Deficiency
Penalty
1940
$ 6,522.71
$ 3,487.94
1941
10,415.99
5,208.00
1942
36,187.06
18,093.53
1943
15,019.38
7,509.69
1944
6,527.95
None
Jeopardy assessments of *253 the above deficiencies and fraud penalties have been made under section 273, I.R.C.
The parties agreed that the evidence presented in the cases of Max Cohen, Docket Nos. 12038 and 12039 [9 TC 1156]; Robert L. Carnahan, Docket Nos. 12040 and 12041 [9 TC 1206]; G. A. Comeaux, Docket No. 12010 [10 TC 201], and Ralph Leonard Polk, Docket No. 12,097 [7 TCM 51] may be considered in this case in so far as material and relevant thereto. The cases of these five taxpayers were tried consecutively at Kansas City, Missouri. The issues are: 1. Did the Commissioner err in adding to income of petitioner certain payments made by him to Robert L. Carnahan, which were apportioned by Carnahan to himself, Cohen and others, and in holding that such payments constituted payments for protection against raids and arrests by the law enforcement officials of Sedgwick County and the State of Kansas? 2. Did the Commissioner err in determining that salaries and expenses of operating an illegal business are not deductible for income tax purposes? 3. Did the Commissioner err in determining that deficiencies for each of the *254 taxable years 1940 to 1943, inclusive, were due to fraud with intent to evade tax? 4. In the alternative, did the Commissioner err in determining that over 25 per centum of gross income was omitted by petitioner in his income tax return for the year 1941 and that consequently, the five-year limitation period for assessment and collection is applicable for such year? Findings of Fact The petitioner duly filed his Federal income tax returns for the years 1940 to 1944, inclusive, with the collector of internal revenue, district of Kansas. Notice of deficiencies was mailed to petitioner July 12, 1946. The Overflow Club is a night club situated in Sedgwick County, Kansas, where liquor was illegally sold and gambling illegally conducted during the years 1940 to 1943, inclusive. The petitioner was the sole owner and operator of the Overflow Club during the taxable years here involved. The 33rd Street Service Station, located adjoining the Overflow Club, was a place where liquor was illegally sold during the years 1943 and 1944. The 33rd Street Service Station was owned by petitioner for the year 1943 and was operated by one Herndon, as an employee. During 1944 it was operated by *255 one Ted Johnston, in partnership with petitioner. Robert L. Carnahan furnished the original bank roll, or operating fund, to the petitioner for operating the gambling activities in the Overflow Club. Carnahan and Max Cohen were, during the taxable years, residents of the State of Kansas, who represented to the illegal operators of night clubs that they could afford them protection against raids and prosecution by the State and County officials. In consideration therefor the owners and operators of such illegal businesses made payments to Carnahan and/or Cohen, generally on the basis of a percentage of profits, which payments were usually divided equally between Carnahan and Cohen. If the owner or operator of the illegal business declined or demurred at paying such percentage, expressed or implied threats were made either by Carnahan or Cohen directly or by their representatives. These threats sometimes took the form of threats to have the club padlocked by the State or County officials. At other times the threats implied directly or indirectly the use of violence against the party in question. As a consequence of demand by Carnahan for a share in the profits of the Overflow Club, *256 petitioner agreed to pay him a percentage of such profits, which varied from time to time from 40 per cent to 75 per cent. Pursuant to such arrangement, during the years 1940 to 1943, inclusive, petitioner made payments to Carnahan, which Carnahan apportioned to himself, Cohen, and others. Neither Carnahan nor Cohen ever rendered any physical services toward the operation of the Overflow Club or the 33rd Street Service Station. Petitioner was never arrested during the period when he made payments to Carnahan. It was the practice to accumulate the profits until they reached an amount considered sufficient for a "split-up" or "cut." When such a "split-up" was to be made the bank roll was first paid back to Carnahan. The balance left after repayment of the bank roll and the "split-up" between petitioner and Carnahan was kept as the new bank roll. The payments made to Carnahan were in turn divided between Carnahan, Cohen, and other persons, in accordance with arrangements among themselves. The payments made to Carnahan after repayment of the bank roll advanced by him were payments for protection against raids and arrests by the law enforcement officials of Sedgwick County and the *257 State of Kansas, and were not deductible in computing petitioner's income. For the year 1940 salaries of $7,366.39 paid to persons engaged in operating the gambling room of the Overflow Club were deducted in computing the total taxable income reported from the Overflow Club but disallowed by the Commissioner. For the year 1940 petitioner allocated 60 per cent of the reported profits from the Overflow Club to Carnahan which sum, aggregating $15,408, was divided equally among Carnahan, Cohen, S. S. Freeman and E. M. Keirn. The Commissioner determined that the Overflow Club was not operated on a partnership basis for such year and that the above sums, aggregating $15,408, were not deductible for income tax purposes. For the year 1941 salaries of $11,771.51 paid to persons engaged in operating the gambling room of the Overflow Club were deducted in computing the total taxable income reported from the Overflow Club, which deduction has been disallowed by the Commissioner. For this year the sum of $18,311.33 was paid to Carnahan and allocated $5,051.40 to Carnahan, $5,051.40 to Cohen, $3,472.84 to Freeman, $3,472.84 to Keirn and $1,262.85 to Joe LaSalle (an employee of Carnahan "whose *258 duties were to watch the petitioner and to assist in the counting of the bank roll"). The above total was claimed as a deduction in computing the taxable income from the Overflow Club as reported by petitioner and disallowed by the Commissioner. For the year 1942 salaries of $17,526 paid to persons engaged in operating the gambling room of the Overflow Club were deducted in computing the total taxable income reported from the Overflow Club, which deduction was disallowed by the Commissioner. For this year, the sum of $39,958.38 was paid to Carnahan and by him allocated $17,482.94 to Carnahan, $17,482.95 to Cohen, $2,497.40 to LaSalle, $2,495.09 to Ralph Polk and claimed as a deduction in computing the taxable income of the Overflow Club reported by petitioner, which sums the respondent disallowed as not deductible for income tax purposes. For the year 1943 salaries and other expenses of operating the Overflow Club, totaling $8,855.81, were claimed as deductions in computing the total taxable income reported from the Overflow Club and were disallowed by the Commissioner. For this year petitioner allocated the sum of $4,199.05 to Carnahan, on the basis of a partnership division, *259 in computing petitioner's taxable income from the Overflow Club. The Commissioner determined that the Club was not operated as a partnership for the year 1943 and that the sum of $4,199.05 allocated to Carnahan, represented a payment for protection and was not deductible for income tax purposes. The said sum of $4,199.05 was apportioned by Carnahan $1,919.45 to himself, $1,919.45 to Cohen and $360.15 to LaSalle. For the same year petitioner allocated 40 per cent of the reported income from the 33rd Street Service Station, in the amount of $8,720, to Carnahan, on the basis of partnership division, in computing petitioner's taxable income from the 33rd Street Service Station. The Commissioner determined that the 33rd Street Service Station was not operated on a partnership basis for the year 1943 and that the sum of $8,720 allocated to Carnahan represented a payment for protection, which was not deductible for income tax purposes. Said payment of $8,720 was apportioned $4,360 to Carnahan and $4,360 to Cohen. Also for the same year salaries and other expenses totaling $1,427.32, incurred in operating an illegal liquor store, were claimed as a deduction by the partnership of Clemons and *260 Herndon in computing the reported taxable income of such business, which deduction was disallowed by the Commissioner. The Commissioner determined that a proportionate amount in the sum of $570.92 constituted additional taxable income to petitioner. For the year 1944 salaries and other expenses of operating an illegal liquor business, in the total sum of $11,186.84, were claimed as a deduction by the partnership of Ted Johnston and Fred D. Clemons, d/b/a as 33rd Street Service Station, in computing the reported taxable income of such business, which deduction was disallowed by the Commissioner. The Commissioner thereupon determined that the sum of $8,390.14 (75 per cent of petitioner's partnership interest) constituted additional taxable income to petitioner. The salaries of $7.366.39 for 1940; $11,771.51 for 1941 and $17,526 for 1942 paid to persons engaged in operating the gambling room at the Overflow Club, were deductible for income tax purposes. Salaries and other expenses, totaling $8,855.81 for the year 1943, of operating the business of the Overflow Club, $1,427.32 also for the year 1943 for operating the liquor store owned by Clemons and run by Herndon, and salaries and *261 other expenses totaling $11,186.84 for the year 1944 for operating the business of the 33rd Street Service Station by the partnership of Johnston and Clemons were all deductible for income tax purposes. The payments made by Clemons to Carnahan of $15,408 for 1940; $18,311.33 for 1941; $37,463.29 ($39,958.38 minus $2,495.09 paid to Polk) for 1942, and $12,919.05 for 1943, which sums were apportioned by Carnahan to himself, Cohen and others, constituted payments for protection against raids and arrests by the law enforcement officials of Sedgwick County and the State of Kansas in the illegal operation of liquor and gambling businesses and which payments were not deductible for income tax purposes. Polk was an employee of petitioner on a percentage of profits basis. Petitioner filed false and fraudulent income tax returns for the years 1940 to 1943, inclusive, with intent to evade tax. The statutory period of limitation on assessment and collection had not expired for any of the years 1940 to 1944, inclusive, when the Commissioner mailed his notice of deficiencies. Opinion VAN FOSSAN, Judge: The first issue presented is the question of payments for "protection." Respondent contends *262 that all of the payments to Carnahan, allocated by him to himself, Cohen and others, were payments for protection from arrest and prosecution by public officials. This petitioner denies, albeit Carnahan, as a witness, said not a word in denial of the charge. The record, however, is eloquent. Asked to relate conversations had with petitioner about the operation of the Overflow Club, one witness stated: "Well, he told me that Carnahan come in there and told him he wanted a bit of that business, that he had - Carnahan, he said, 'Well, I thought Max [Cohen] had the fix around here.' He said, 'No,' he said, 'I have got the state. I want part of this place.' And he says, 'Well, I will see Max about that.' He says, 'Well, all right, you see him and see what he says.' And he told me that, later, that he had called Max and Max said that anything he did with Carnahan was all right with him, he was in agreement." Asked as to any additional conversation with petitioner, the witness stated: "Yes, sir. He said that he would - they wanted part of his business, and that there wasn't nothing that he could do about it, and that if he didn't give them part of the business, why, they would have Chick *263 Fisher come down there and put a padlock on his door, he would have a white elephant on his hands." Again the witness stated: "Well, he told me that Carnahan told him he didn't know enough to run his place and that he would have to send and get some boys to run it for him. He says, 'Why, I can't even run my own casino back there,' he says, 'they are going to take charge of it.' And he says, 'They have got charge of it back there now.'" When the witness was asked: "Did he ever tell you why he had entered into an arrangement with Mr. Carnahan or Mr. Cohen?", he replied: "For the simple reason that if he didn't, why, he says, 'I would have a white elephant on my hands here,' he says, 'they would do to me what they did to the Rock Castle'", and "Did he ever tell you what they did to the Rock Castle?", he replied: "They had the state padlock it." When petitioner was asked about the operation of night clubs in Sedgwick County and the payment of money for protection he replied: "I don't know nothing", which statement we have said in G. A. Comeaux, 10 T.C. 201 "is pregnant with the unrevealed truth." The above specific evidence is corroborated by much of the evidence, direct *264 and inferential, to be found throughout the more than one thousand pages of evidence heard in the combined cases. It all points to one conclusion. Cohen and Carnahan had set themselves up as the overlords of the illegal gambling business of Sedgwick County, Kansas, and would brook no interference with their absolute rule. Whether it be called the furnishing of protection or the exaction of tribute is immaterial. Payments for neither purpose are deductible in computing taxable income. Petitioner, in rejoinder, points to the fact that Carnahan furnished the bank roll for the Club and argues that the payments were merely a division of the profits earned in the gambling business. Though we have found as a fact that Carnahan furnished the bank roll, the conclusion asked does not follow. We have also found it to be a fact that Cohen and Carnahan exacted payments for the illegal operation under the guise of protection. The record does not establish what specific sums were paid because of furnishing the bank roll and what part was a payment of tribute, or for "protection." The protection consideration is basic in all of the payments to Carnahan. Camouflage their relations as you may, the payments *265 were primarily for what we have called "protection." Petitioner also endeavored to establish that he was in partnership with Carnahan. This attempt likewise failed. It follows that the payments to Carnahan were not deductible in computing the income earned by petitioner from the operation of the Overflow Club and the 33rd Street Service Station. The second issue relates to the deduction of salaries paid to various persons and other expenses incurred in the operation of the Club and Service Station, or, as we have said in G. A. Comeaux, supra, the "legitimate expenses of an illegitmate business." We held in the Comeaux case that such expenses were deductible and make a similar ruling here. The amounts appear in the findings of fact. The third issue is a question of fraud. We have found as a fact that petitioner filed false and fraudulent tax returns for the years 1940 to 1943, inclusive. This conclusion of fact is based on the whole record of petitioner's income tax accounting, the omission of large items from his income tax returns, the claiming of deductions wholly without the law and other practices apparent on an examination of the voluminous record. Respondent's *266 action in assessing penalties for the years stated is, therefore, approved. The above disposition of the fraud issue makes unnecessary a discussion of the fourth or alternative issue. Decision will be entered under Rule 50.